CUYLER SHAW            1413-0
KEVIN W. HERRING       6722-0
MIRANDA TSAI           8308-0
ASHFORD & WRISTON
1099 Alakea Street, Suite 1400
P.O. Box 131, Honolulu, Hawaii 96810
Telephone: (808) 539-0400
Email: cshaw@awlaw.com
Attorneys for THE STATE OF HAWAII

DON JEFFREY GELBER     0628-0
GELBER GELBER & INGERSOLL
745 Fort Street, Suite 1400
Honolulu, Hawaii 96813
Telephone: (808) 524-0155
Email: D.J.Gelber@gelberlawyers.com
Attorney for THE GAS COMPANY, LLC

KIMO C. LEONG          2977-0
TAYLOR LEONG & CHEE
737 Bishop Street, Suite 2060
Honolulu, Hawaii 96813
Telephone: (808) 528-2222
Email: kcleong@hawaii.rr.com
Attorney for HAWAIIAN ELECTRIC COMPANY, INC.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| In re<br>ALOHA AIRLINES, INC.,<br>a Delaware corporation, et. al.<br>　　　　Debtors. | CASE NO. 08-00337<br>(Chapter 7)<br>(Jointly Administered) |
| STATE OF HAWAII; THE GAS COMPANY,<br>LLC; and HAWAIIAN ELECTRIC<br>COMPANY, INC. | ADV. PROC. NO. 09-90042 |
| 　　　　Plaintiffs,<br>　　vs. | **PLAINTIFFS' MEMORANDUM<br>IN OPPOSITION TO<br>DEFENDANTS' MOTION TO<br>DISMISS** |
| DANE FIELD, CHAPTER 7 TRUSTEE FOR<br>ALOHA AIRLINES, INC.; GMAC<br>COMMERCIAL FINANCE, LLC; YUCAIPA<br>CORPORATE INITIATIVES FUND I, LP; (<br>YUCAIPA CORPORATE INITIATIVES<br>FUND I, LLC; et al., | **HEARING**<br>**DATE:  December 10, 2009**<br>**TIME:   9:30 A.M.**<br>**JUDGE: The Honorable Lloyd King** |
| 　　　　Defendants. | **RELATED DOCKET: 11** |

# TABLE OF CONTENTS

                                                                          **Page**

I.     **INTRODUCTION** ................................................................ 1

II.    **HISTORY OF THE SALES** ............................................. 2

    A.   Aloha Files for Protection under Chapter 11 ....................... 2

    B.   Aloha Seeks and Obtains Post-Petition Working Capital Financing for the Continued Operation and Sale of the Air Cargo Division and Contract Services Division ............................. 3

    C.   The Court Approves the Proposed Sale of the Contract Services Division and Provides That Net Proceeds of the Sale Be Paid to GMAC ........................................................ 7

    D.   The Case is Converted to Chapter 7 ................................. 8

    E.   The Sale of the Contract Services Division Is Closed ........................ 11

    F.   The Air Cargo Division is Sold and Closed ....................... 11

    G.   HECO, Gasco, and the State File Requests for Allowance of Administrative Expense and Payment of Costs of Sale ............... 13

    H.   Proceedings in the Main Bankruptcy Case on Motion and Requests for allowance of Administrative Expenses and Payment of Costs of Sale ................................................ 14

    I.   The Plaintiffs' Complaint ................................................ 16

III.   **ARGUMENT** .................................................................. 17

    A.   In the Complaint, Plaintiffs Seek Recovery of Costs of Sale, Not of Their Larger Chapter 11 Administrative Expense Claims ...................................................... 18

    B.   The Complaint Is Not an Attempt to Surcharge GMAC's Collateral Pursuant to § 506(c) ..................................... 19

        (1)   GMAC and Yucaipa Have Mischaracterized the Relief the Plaintiffs Seek ........................................ 19

        (2)   The Court's Prior Orders Do Not Bar Recovery ................ 20

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 2 of 41

(3)   The Complaint's Equity Counts Are Rooted in the
Court's Prior Orders and Are Not Preempted ......................... 22

(4)   *Hen House* Does Not Bar a Claim for Disgorgement
of Improperly Disbursed Funds............................... 29

C.   The Complaint Pleads Sufficient Facts for Relief ............................ 31

IV.   **CONCLUSION** ..................................................................... 32

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 3 of 41

# TABLE OF AUTHORITIES

                                                                        Page(s)

## CASES

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................... 31

*Bank of Marin v. England*, 385 U.S. 99 (1966) ................................. 25

*Bell Atl. Corp. v Twombly*, 550 U.S. 544 (2007) ............................... 31

*In re Brown Brothers, Inc.*, 136 B.R. 470 (W.D. Mich. 1991) ................................................................................... 21

*Cox v. Zale Delaware Inc.*, 242 B.R. 444 (N.D. Ill. 1999) ................. 26

*Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000) ................................................................... 29-30

*MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910 (9th Cir. 1996) ....................................................... 26, 27, 28

*Lenoir v. GE Capital Corp.*, 231 B.R. 622 (Bankr. N.D. Ill. 1999) ................................................................................ 26, 27

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) ........................ 24

*Pepper v. Litton*, 308 U.S. 295 (1939) ............................................ 24

*Pereira v. First N. American Nat'l Bank*, 223 B.R. 28 (N.D. Ga 1998) ............................................................................ 26, 27

*Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417 (6th Cir. 2000) ................................................................................... 26

*In re Ridgeline Structures, Inc.*, 154 B.R. 831 (Bankr. D. N.H. 1993) ............................................................................ 21

*Thompson v. Margen* (*In re McConville*), 110 F.3d 47 (9th Cir. 1997) ............................................................................ 25

*In re Tucson Yellow Cab Co.*, 789 F.2d 701 (9th Cir. 1986) .............. 25

*Young v. U.S.*, 535 U.S. 43 (2002) ................................................. 24

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 4 of 41

                                                              Page(s)

**Statutes**

*11 U.S.C. § 506(c)*.............................................................1, 17, 19,
                                                              21, 24

*Bankruptcy Code § 105; 11 U.S.C. § 105*...........................32-33

*Bankruptcy Code § 362*....................................................27

*Bankruptcy Code § 524*....................................................27


**Other**

Ballantine's Law Dictionary (3d Ed. 1969)........................4

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 5 of 41

<u>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**</u>
<u>**DEFENDANTS' MOTION TO DISMISS**</u>

The Plaintiffs in this adversary proceeding – the State of Hawaii (the "State"), The Gas Company, LLC ("Gasco"), and Hawaiian Electric Company, Inc. ("HECO") – file this memorandum in opposition to the Motion to Dismiss by Defendants GMAC Commercial Finance, LLC ("GMAC"), Yucaipa Corporate Initiatives Fund I, LP, and Yucaipa Corporate Initiatives Fund I, LLC (collectively "Yucaipa"), filed October 2, 2009 (the "Motion to Dismiss").

## I.     INTRODUCTION

The State, Gasco, and HECO seek recovery of costs incurred in the sale of the Aloha Airline's Contract Services Division and Air Cargo Division. The requested relief is grounded in the prior orders of this Court authorizing Aloha Airlines, Inc. to incur debt for the purpose of selling the Contract Services Division and the Air Cargo Division as operating businesses ("going concerns"). This action is not an attempt to surcharge the secured creditor's collateral (which had little or no value unless operated and sold as going concerns) under section 506(c) of the Bankruptcy Code. Rather, the Plaintiffs seek enforcement of the Court's prior orders to recover the portion of money incorrectly paid by the Trustee to

2300050C.doc

- 1 -

GMAC which, instead, should have been paid to the Plaintiffs as costs of sale incurred in the sale of the two divisions.

## II. HISTORY OF THE SALES

### A. Aloha Files for Protection under Chapter 11

Aloha Airlines, Inc. ("Aloha") filed its Chapter 11 bankruptcy petition on March 20, 2008.[1] At the time, Aloha's business was comprised of four operating divisions or discreet business segments: interisland passenger service; transpacific passenger service; cargo services (the "Air Cargo Division"); and contract services (the "Contract Services Division"). *See Declaration of Jeffrey R. Kessler*[2] *in Support of Various First Day Applications and Motions* filed March 20, 2008 [Docket No. 7[3]] ("Kessler Declaration") at ¶24.

Aloha acknowledged from the beginning of the case that the principal objective in filing Chapter 11 was to "commence a process for an orderly <u>sale</u> or <u>disposition</u> of the airline as a whole <u>or</u> its <u>four discreet business segments</u>: inter-

---

[1] There were three affiliated debtors in the Aloha Airlines case. The main operating entity was Aloha Airlines.

[2] Jeffrey R. Kessler was Aloha's Senior Vice President and Chief Financial Officer.

[3] Unless otherwise indicated, references to docket numbers are to the docket numbers in the main bankruptcy case (Case No. 08-00337).

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed  11/23/09   Page 7 of 41

island passenger service, trans pacific passenger service, inter-island cargo, and contract services." Debtor's *Second Amended Motion Emergency Motion for Entry of Interim and Final Orders (A) Approving Secured Postpetition Financing, (B) Granting Adequate Protection and (C) Scheduling Final Hearing* filed March 31, 2008 [Docket No. 143] (the "Interim DIP Loan Motion" ) at ¶15 (emphasis added). Aloha's Chapter 11 objective was to sell its operating divisions – together or separately – not reorganization.

On March 31, 2008, Aloha abruptly ceased and shut down its transpacific and interisland passenger services operations, leaving the Air Cargo Division and the Contract Services Division as Aloha's only remaining operating business segments.

**B.     Aloha Seeks and Obtains Post-Petition Working Capital Financing for the Continued Operation and Sale of the Air Cargo Division and the Contract Services Division**

On March 31, 2008, after the shutdown of the passenger services divisions, Aloha moved the Court for authority to borrow an additional $3 million from its secured lender, GMAC.  In connection with the $3.0 million "DIP Facility," Aloha represented to the Court that:

> 33.     The financing contemplated by the DIP Facility benefits the Debtors' bankruptcy estates and their creditors.  It is critical to the preservation of the value of the Debtors' assets.  The Debtors have already received

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed  11/23/09   Page 8 of 41

an <u>offer to purchase their air cargo business as a going concern</u>.  Without additional financing, the Debtors would not have the ability to continue to operate this business segment.  Absent the liquidity provided by the DIP Facility, the Debtors will be unable [to] meet their obligations and would face an <u>immediate shutdown of their air cargo and contract services operations -- the two most profitable business segments operated by the Debtors</u>.

*Interim DIP Loan Motion* at ¶ 33 (emphasis added).

On April 8, 2008, the Court filed its *Interim Order (A) Authorizing Secured Postpetition Financing under 11 U.S.C. §§ 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d), and FRBP 4001(c); and (B) Granting Adequate Protection under 11 U.S.C. §§ 363 and 364* (the "Interim Financing Order") [Docket No. 211]. Among the purposes of the loan was to  "fund <u>working capital</u> to preserve the value of certain of the Debtors' business segments during the Chapter 11 cases." *Interim Financing Order* at 4 (emphasis added).  At the time, there were only two business segments:  the Contract Services Division and the Air Cargo Division.

The phrase "working capital" is not defined in the Interim Financing Order.  Ballantine's Law Dictionary (3d Ed. 1969) defines it as "a fund kept on hand by a corporation for the purpose of <u>paying current obligations</u> and keeping its credit good, <u>without awaiting the collecting of its revenues</u>."  (Emphasis added.) That is also the common understanding of the phrase.  The clear intent of the

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 9 of 41

Court's order was that the funds advanced were to be used to pay the necessary

current expenses of Aloha's two remaining operating divisions so that they could

be kept alive and sold as going concerns.

The Interim Financing Order provided that the borrowed funds were

to be expended in accordance with a budget that "includes all necessary and

required expenses which the debtors expect to incur during the term of the DIP

Financing." *Interim Financing Order* at ¶18 (p. 41). Paragraph 17 of the Interim

Financing Order, entitled "Application of Collateral Proceeds," provides, in

relevant part, as follows:

> 17. <u>Application of Collateral Proceeds</u>.
> Whether or not an Event of Default or default hereunder
> has occurred and is continuing, the Debtors are hereby
> authorized and directed to remit to the Agent on behalf of
> the DIP Lenders one hundred percent (100%) of all
> collections on, and proceeds of, the Collateral (subject to
> the satisfaction of Permitted Liens in such Collateral after
> notice, hearing and Court order, and subject to the other
> applicable exceptions and limitations as set forth in the
> DIP Financing Agreements), including all collections of
> accounts receivable collections, proceeds of sales of
> inventory, fixed assets and any other assets, including
> sales inside and outside the ordinary course of business,
> and all other cash or cash equivalents that shall at any
> time on or after the date of this Interim Order come into
> the possession or control of the Debtors (except Trust
> Funds), or to which the Debtors shall become entitled at
> any time, <u>which are not required to pay expenses under
> the Budget</u> . . . .

(Emphasis added).

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 10 of 41

Statements made at the hearing on the motion also confirm that the interim financing was intended to pay necessary expenses to permit the Contract Services Division and the Air Cargo Division to be sold as going concerns. At the April 3, 2008 hearing on cash collateral and debtor-in-possession financing arrangements, the Court asked counsel for Aloha why the Chapter 11 case should not be dismissed since the case was apparently being conducted for GMAC's sole benefit. Aloha's counsel countered that the maximization of the value of the Debtor's assets was a legitimate purpose for a Chapter 11 case. Aloha's counsel added:

> MR. SINGERMAN [Counsel for Aloha]: And I believe, Your Honor, that the continued operations of these businesses, while not a distribution under a plan, <u>provides continuing payments to trading partners that are supporting of operations [sic] that are important to the Hawaiian economy</u>. Other than that, Your Honor, I do not believe in the present circumstances, barring something that would be wonderful but unlikely, we are looking at a case, again, outside of the Mesa litigation, that provides a distribution to unsecured creditors.

*Transcript of Hearing, April 3, 2008* [Docket No. 287], at 21 (emphasis added).

Counsel for GMAC joined Aloha's counsel in urging that the case not be dismissed:

> MR. PETTIT [Hawaii counsel for GMAC]: Thank you Your Honor. I'll -- I'll be brief. And GMAC joins in the comments of both of Your Honor and Mr. Singerman. We do have a difficult situation here. One of the -- the valid purposes of this Court is to try to

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 11 of 41

preserve this -- these valuable assets that are left and avoid economic waste. We have touched on benefits to - - indirect benefits, perhaps, <u>to the trade creditors with these ongoing segments of the -- of the business</u>. And the employees, of course, are a very keen concern.

\* \* \* \*

       MR. LIPKE [Mainland counsel for GMAC]: I think Mr. Pettit accurately reflected what our current position is . . . .

       As far as Ms. Neville's [Counsel for the Creditors Committee] comment regarding a surcharge, <u>we are being surcharged by advancing the funds to continue to operate this business I think for the benefit of all parties that Your Honor identified</u>.

*Id.* at 22, 23, 26 (emphasis added).

GMAC's counsel, Mr. Lipke, acknowledged to the Bankruptcy Court that "the cargo business and contract services <u>do not have much value if -- if they're not sold as a going concerns</u>." *Id.* at 37.

Gasco, HECO, and the State were among the "trading partners" which were to receive "continuing payments" for "supporting [the] operations."

### C. The Court Approves the Proposed Sale of the Contract Services Division and Provides That <u>Net Proceeds</u> of the Sale Be Paid to GMAC

On April 24, 2008, the Bankruptcy Court approved the proposed sale of Aloha's Contract Services Division to Pacific Air Cargo. Paragraph I of the Order specified that:

> I.	Closing costs shall be paid as provided in the Asset Purchase Agreement. As provided in the Interim Order (A) Authorizing Secured Postpetition Financing under 11 U.S.C. §§ 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d), and FRBP 4001(c); and (B) Granting Adequate Protection under 11 U.S.C. §§ 363 and 364 (the "Interim Financing Order"), at Closing the <u>net proceeds</u> of the Sale shall be delivered by the Debtors to GMAC Commercial Finance, LLC.

(Emphasis added.) *Order (A) Authorizing Sale of Debtors' Contract Services Assets Pursuant to 11 U.S.C. §363 Free and Clear of Liens, Claims, and Encumbrances and (B) Approving Assumption and Assignment of Assumed Contracts*, filed April 24, 2008 [Docket No. 331] (the "Contract Services Division Sale Order").

### D.	The Case is Converted to Chapter 7

On April 28, 2008, citing insufficient liquidity to continue to operate its Air Cargo Division and Contract Services Division, Aloha elected to convert the Chapter 11 case to a Chapter 7 case. On April 29, 2008, the Court entered an *Order Converting Chapter 11 Cases to Cases Under Chapter 7* [Docket No. 358]. The following day, the Office of the United States Trustee filed its *Notice of Appointment of Trustee* [Docket No. 364].

On May 2, 2008, the Court entered its *Order Authorizing (I) Trustee to Operate Air Cargo Business Pursuant to 11 U.S.C. § 721, (II) Advance of Funds for Trustee's Administration of Estates and For Benefit of Unsecured Creditors,*

2300050C.doc

- 8 -

*and (III) Postpetition Advances to Maintain Business Operations of Air Cargo*

*Business Through Sale Closing* (the "721 Order") [Docket No. 390].

The 721 Order recited that the Trustee had entered into a Letter of

Intent with Saltchuk Resources, Inc. concerning a sale of the Air Cargo Division.

Under the Letter of Intent "GMAC agree[d] to advance funds necessary to fund the

immediate resumption and continuation of operations of the Air Cargo Business."

[Docket No. 393.1.]

At the hearing on approval of sale of the Air Cargo Division and the

721 Order, GMAC committed to advance whatever funds were necessary "to make

sure the operations were continued through the date of sale."

> MR. LIPKE [counsel for GMAC]: Yes, Your
> Honor, it provides in -- in the order that -- that GMAC is
> going to advance whatever funds are necessary to -- to
> make sure that the operations are continued through the
> date of the sale. So I don't know if that's what Mr.
> Fields means by carve out, but we -- we're committing in
> this order actually to do that.

*Transcript of Hearing, May 1, 2008* [Docket No. 498], at 101.

The Court was specifically concerned about the payment of operating

expenses:

> THE COURT: Mr. Lipke, this is Judge King.
> Could you please direct us to the provision that addresses
> your client's willingness to encounter payment of
> administrative expenses?

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed  11/23/09   Page 14 of 41

MR. LIPKE:  It's --

THE COURT:  Or operating expenses of the cargo division.

MR. LIPKE:  -- paragraph E, Your Honor.

THE COURT:  That says your client is authorized to, but that doesn't carry much weight if your client decides it doesn't want to.

MR. ROBINSON:  Your Honor, this is Charles Robinson on behalf of Saltchuk.  I -- I would also direct the Court to look at the letter of intent that we have executed with GMAC.  Under paragraph seven of the letter of intent, they have agreed with that they have agreed in -- in our agreement that they would front those costs.

MR. LIPKE:  It -- it -- I was -- yeah, that's correct, Your Honor.

*Id.* at 119.

The 721 Order also provided for an administrative expense "carve-out" from the proceeds of the Air Cargo Business of "five percent (5.00%) of the proceeds, <u>net of fees and expenses incurred in the sale</u>." *721 Order* at ¶ 5 (emphasis added).  Fees and expenses incurred in the sale were to be deducted prior to the application of the carve-out, and prior to the net distribution to GMAC.

Paragraph 8 of the same order states, in relevant part, as follows:

8.      As provided in Paragraph 17 of the Interim Financing Order, the <u>net proceeds of the Sale</u> of the Air Cargo Business and any other Collateral (including, without limitation, any deposits of the Debtors which are returned after the assumption and assignment of any

U.S. Bankruptcy Court - Hawaii  #09-90042   Dkt # 20   Filed 11/23/09   Page 15 of 41

executory contracts or leases) <u>shall be delivered by the Debtors to GMAC</u> . . . .

*721 Order* at ¶ 8 (emphasis added).

### E.    The Sale of the Contract Services Division Is Closed

Although approved earlier on May 24, 2008, the sale of the Contract Services Division did not close until after the conversion of the case to Chapter 7.

The sale of the Contract Services Division to Pacific Air Cargo, LLC closed on May 2, 2008.  The gross proceeds of sale were $3,123,906.  Of this amount, $31,329 was paid to Imperial Capital, LLC for services rendered in the Chapter 11 case. The remainder, $3,101,577, was paid to GMAC.  See *Trustee's Report of Sale (Contract Services)*, filed July 3, 2008 [Docket No. 884].

Left unpaid were the costs of the goods, services, rental space, and landing rights provided by the Plaintiffs, without which the Contract Services Division could not have been sold as a going concern.

### F.    The Air Cargo Division is Sold and Closed

The sale of the Air Cargo Business to Aeko Kula, Inc. closed about two weeks later on May 14, 2008.  The gross sale proceeds were $17,447,071.  Of this amount, $12,805,296.08 was paid to GMAC, and $3,506,362.06 was remitted to the Trustee.  See *Trustee's Report of Sale (Cargo Division)*, filed July 3, 2008 [Docket No. 883].    The Trustee's Report indicates that $1,135,412.86 was paid

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed  11/23/09   Page 16 of 41

toward "Sales Expenses," which consisted of a number of "cure payments" and costs of UCC filings.

Left unpaid were the costs of the goods, services, rental space, and landing rights provided by the Plaintiffs, without which the Air Cargo Business could not have been sold as a going concern. [4]

Thus, with the closing of the sales of the Contract Services Division and the Air Cargo Division, the Trustee received approximately $20.6 million. Of this sum, approximately $16.0 million was paid to GMAC. Approximately $1.2 was paid as "sales expenses," but no payments were made to the Plaintiffs for the electricity, liquefied petroleum gas, rental space, and landing rights that kept the Contract Services Division and the Air Cargo Division alive for sale.

---

[4] We do not know how much of the $3.0 million provided for in the Interim Financing Order was actually lent to Aloha. No monthly operating report was ever filed by Aloha. Upon conversion of the cases to Chapter 7 cases, the Court ordered that: "Not later than 30 days after the date of this order, the Debtors must file and transmit to the United States Trustee a final report and account." *Order Converting Chapter 11 Cases to Cases Under Chapter 7*, filed April 29, 2008, at ¶ 8 [Docket No. 358]. No such report and account was ever filed. The Trustee's interim accounting, filed December 31, 2008 [Docket No. 1276], for the Chapter 7 portion of the case only, shows that, on May 14, 2008, there was a receipt from GMAC of $1.25 million to the payroll account. Six days later, on May 20, 2008, the estate disbursed $1.5 million to GMAC. The memo notation reads "GMAC – available funds payment." The Trustee and GMAC knew how to get GMAC paid. Although the funds were "available," the State, Gasco, and HECO were not paid sums owed for costs of sale – in the aggregate a much smaller amount.

2300050C.doc                          - 12 -

**G.    HECO, Gasco, and the State File Requests for Allowance of Administrative Expense and Payment of Costs of Sale**

On August 26, 2008, September 10, 2008, September 16, 2008, and October 27, 2008, HECO, Gasco, and the State filed requests and motions for allowance of administrative expenses for the Chapter 11 and the Chapter 7 periods, and payment of costs of sale related to the sale of the Contract Services Division and the Air Cargo Division (and, in the case of HECO, also related to the sale of certain miscellaneous tangible assets[5]).  [See Docket Nos. 1031, 1070, 1095, and 1182.]  The total amount of the claimed administrative expenses was $1,133,260.30.  Of this amount, approximately $544,433.35 represents costs of sale for which HECO, Gasco, and the State have not been paid.

On September 19, 2008, the Trustee filed an *Omnibus Response* [Docket No. 1099-2] to a number of administrative claimants, including Gasco.  In the response, the Trustee contended that allowance and payment of any Chapter 11 administrative claims was premature.  The Trustee characterized Gasco's Chapter 7 claim as "most probably a 'cost of sale.'"  *Omnibus Response* at ¶ 20.

---

[5]    HECO furnished $20,668.20 in electric utility services to areas at the Honolulu International Airport where the Debtor and, subsequently, the Trustee stored, and from which the Trustee sold, miscellaneous tangible assets.  There has been no accounting to HECO of the amount received by the Trustee from the Trustee's sale of the miscellaneous tangible assets and no payment to HECO for the electricity furnished.

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 18 of 41

**H. Proceedings in the Main Bankruptcy Case on Motion and Requests for Allowance of Administrative Expenses and Payment of Costs of Sale**

A hearing was held on October 9, 2008, on the requests and motion for allowance of administrative expenses and the payment of those portions that constituted costs of sale of the Contract Services Division and the Air Cargo Division.

At the October 9, 2008 hearing, the Court noted that "This wasn't supposed to happen. GMAC was supposed to cover the expenses -- and apparently it hasn't." *Transcript of Hearing, October 9, 2008* [Docket No. 1174], at 24. The Court correctly noted the crucial difference between Chapter 11 administrative claims in general (which are not the subject of this action) and the costs incurred in the sale of the Air Cargo Division and the Contract Services Division:

> THE COURT: Do you have any -- can you make a reasonable guess as to the total claims that might be outstanding that would be of the nature that we're talking about at this hearing?
>
> MR. CHOI (for the Trustee): Your -- your Honor, it would be very difficult for me to even risk an educated guess, because we have claims filed as -- for Chapter 11 requests for payment of administrative expenses that total many millions of dollars. A lot of those claims related to the passenger operation, a large portion relate to employee Warren [sic] Act rights, and a portion of those claims, I am sure, arose post March 30 and were ---

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 19 of 41

THE COURT:    Are -- are -- are they claims that can be charged to the proceeds of sale of contract services and air cargo?  See that's where I -- I think we're having the problem.  To me, at least as we sit here today, I -- I don't think it matters whether those are Chapter 7 or Chapter 11, they're claims against the proceeds.  They're claims that enable the collateral to be liquidated and the net proceeds paid to GMAC.

*Id.* at 26-27.

Thereafter, on November 4, 2008, the Trustee filed a *Statement Regarding Administrative Expense Claims and Costs of Sale Issues* [Docket No. 1206], in which the Trustee described a process by which all claims for administrative expenses, whether arising before or after conversion, were classified by the Trustee as either (i) a cost of sale ("COS"), (ii) in part a cost of sale ("PART COS"), or (iii) not a cost of sale ("NOT COS").  The Chapter 11 claims of each of the Plaintiffs were characterized as "PART COS."  The Trustee thus recognized (although belatedly) the distinction between administrative claims in general (to be paid according to the priority provisions of the Bankruptcy Code) and those administrative expenses which constituted costs of sale of the Contract Services Division and the Air Cargo Division (to be paid from the proceeds of sale according to the Court's orders).

A further hearing was held on November 10, 2008.  After considerable discussion, the Court noted that, if the parties were unable to resolve

U.S. Bankruptcy Court - Hawaii  #09-90042   Dkt # 20   Filed 11/23/09   Page 20 of 41

the matter, an adversary proceeding would be required, saying that the "motion by [Gasco, and joined in by HECO] should be converted to an adversary proceeding because it is – it's going to be a long and complicated procedure." *Transcript of Hearing, November 10, 2008* [Docket No. 1525], at 30; *see also Transcript of Hearing, December 3, 2008* [Docket 1254], at 37. The Plaintiffs, therefore, filed their Complaint initiating this adversary proceeding.

## I.      The Plaintiffs' Complaint

The Complaint herein seeks :

(1)     A judgment against the Trustee directing the Trustee to pay for certain goods, services, rental space, and landing rights provided by the Plaintiffs to Aloha's Air Cargo Division and Contract Services Division which constitute costs of selling the Air Cargo Division and the Contract Services Division and which should have been paid by the Trustee prior to distributing net sale proceeds to GMAC; and

(2)     A judgment against GMAC and/or Yucaipa ordering GMAC and/or Yucaipa to disgorge to the Trustee for payment to the Plaintiffs (or to disgorge to Plaintiffs directly) the amount of money that should have been deducted from the sale proceeds and paid to the Plaintiffs as costs of sale but, instead, was incorrectly distributed to GMAC.

U.S. Bankruptcy Court - Hawaii  #09-90042   Dkt # 20   Filed 11/23/09   Page 21 of 41

GMAC and Yucaipa, in support of their Motion to Dismiss, contend (1) that the two bankruptcy court orders relied on by Plaintiffs specifically bar any action or claim to surcharge either lender or their collateral, (2) that § 506(c) of the Bankruptcy Code does not permit non-trustees, such as Plaintiffs, to surcharge a secured creditor's collateral, and (3) that the Plaintiffs' counts stating equitable grounds for relief, which the Defendants call "state law claims," are preempted by the federal bankruptcy law. GMAC and Yucaipa request that the Court dismiss all claims against them with prejudice. *See* Defendants' *Memorandum of Points and Authorities*, filed October 2, 2009 ("Defendants' Memorandum") [Docket No. 11 in this proceeding], at 17.

## III. ARGUMENT

GMAC and Yucaipa's argument, in support of their Motion to Dismiss, consists of two parts. First, GMAC and Yucaipa assert that, as secured creditors, they have priority over the Plaintiffs' costs-of-sale claims. Second, they assert that the Plaintiffs cannot surcharge GMAC's and Yucaipa's collateral. GMAC and Yucaipa mischaracterize the relief sought; their arguments are without merit; and the Court should deny the Motion.

2300050C.doc

- 17 -

### A. In the Complaint, Plaintiffs Seek Recovery of Costs of Sale, Not of Their Larger Chapter 11 Administrative Expense Claims

GMAC asserts that, because the Court granted superpriority to GMAC and Yucaipa in the Interim Financing Order, their claims are superior to the Plaintiffs' costs-of-sale claims. Even without regard to the Interim Financing Order, GMAC and Yucaipa claim priority over the Plaintiffs as secured creditors, the claims of which are generally entitled to priority over administrative claims.

The Plaintiffs do have administrative expense claims, but those claims are larger in amount than their claims for unpaid costs of sale and are not the subject of this proceeding.[6]

This adversary proceeding was commenced in order to collect payment for goods, services, rental space, and landing rights provided to the estate for the purpose of selling the Contract Services Division and Air Cargo Division. The order that authorized the sale of the Contract Services Division provided that "net proceeds" from the sale would be delivered to GMAC. The Interim Financing Order directed that only sale proceeds which were "not required to pay expenses

---

[6] For example, Gasco's total administrative expense claim for the pre-conversion period is $85,433.38. Gasco's claim for costs of sale amounts to $48,993.22. The State's total claim for the same period is $886,147.86 while its costs of sale claim amounts to $259,713.36. HECO's total Chapter 11 administrative expense claim is $153,063.66, but its costs of sale claim for Chapter 11 is $132,335.06.

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 23 of 41

under the Budget" would be applied to repayment of GMAC and Yucaipa. Similarly, the 721 Order directed that GMAC be paid the proceeds "net of fees and expenses incurred in the sale" according to the priority scheme established in the Interim Financing Order.

The amounts claimed by the Plaintiffs in this action consist only of that portion of their claims that constitute unpaid costs of sale. The Plaintiffs do not seek to overturn the provisions of the Code but rather they seek the enforcement of the Court's orders and the distribution of the sale proceeds as contemplated by those orders.

**B.    The Complaint Is Not an Attempt to Surcharge GMAC's Collateral Pursuant to § 506(c)**

GMAC and Yucaipa characterize the Plaintiffs' claims as an attempted surcharge pursuant to section 506(c) of the Bankruptcy Code and offer three reasons why the alleged surcharge cannot succeed: (1) that it is barred by waiver, (2) that it is preempted, and (3) that a right of surcharge cannot be asserted by a non-trustee. There are four reasons why GMAC and Yucaipa's arguments fail.

**(1)    GMAC and Yucaipa Have Mischaracterized the Relief the Plaintiffs Seek**

The Plaintiffs are not seeking to surcharge the secured creditor's collateral. A surcharge is a claim made against the property to which a secured

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 24 of 41

creditor is otherwise entitled. In this case, under the Court's orders, GMAC and, secondarily, Yucaipa were entitled to only the net proceeds of sale after payment of the costs of sale. The Debtor, and subsequently the Trustee, did not pay for the goods, services, rental space, and landing rights they used to operate and sell the Contract Services Division and Air Cargo Division, and the Trustee turned over more sale proceeds than GMAC was entitled to under the Court's orders. The Plaintiffs look not to section 506(c) for their recovery but to the prior orders of this Court directing the Debtor-in-Possession and the Trustee to pay the costs and expenses of sale prior to the distribution of net proceeds to GMAC.

### (2) The Court's Prior Orders Do Not Bar Recovery

GMAC and Yucaipa claim that the provisions of the Interim Financing Order and the 721 Order, in which the Debtor and the Trustee purported to waive the right to surcharge, bar the Plaintiffs' recovery. The purported waivers of the right to surcharge were part of the same orders that provided that the costs of operation and sale were to be paid and that only the net proceeds were to be turned over to GMAC.

The Debtor's purported waiver was undertaken not in isolation but in the context of, and as part of, the orders that provided for the working capital to pay the costs of keeping the Contract Services Division and Air Cargo Division alive (including paying for the goods, services, space, and landing rights supplied

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 25 of 41

by the Plaintiffs) so that they could be sold as going concerns. The waiver of the right to surcharge must be read in connection with the other provisions of the same orders that provided for the working capital to pay current expenses and for the distributions of net proceeds of sale to the secured creditors. The waiver of the right to surcharge assumes that the other provisions of the Court's orders have been (or will be) obeyed, that necessary costs and expenses of operation and sale have been (or will be) paid, and that only the net proceeds of sale are to be distributed to the secured creditors. The waiver of surcharge was not intended to shield GMAC if it received more sale proceeds than it was entitled to under the Court's orders.[7]

---

[7] Some courts have taken the position that waivers of section 506(c) surcharge rights, such as the one contained in the Interim Financing Order, are against public policy and per se unenforceable. In *In re Ridgeline Structures, Inc.*, 154 B.R. 831 (Bankr. D. N.H. 1993), the Court refused to approve a proposed stipulation and order which provided "that no expense of administration will be charged against the secured party under § 506(c) no matter what action, inaction, or acquiescence by [the secured creditor] might occur." *Ridgeline*, 154 B.R. at 832. Here, the Interim Financing Order provided that "no action, inaction, or acquiescence by the DIP Lenders ... shall be deemed to be or shall be considered as evidence of any alleged consent ... to a charge against the Collateral ... pursuant to sections 506(c), 552(b) or 105 of the Bankruptcy Code." Interim Financing Order at ¶15. In rejecting this sort of provision, the Court said that it "is not authorized to and never would insulate any party from the consequences of their conduct no matter how egregious." *Id.; see also In re Brown Brothers, Inc.*, 136 B.R. 470, 474 (W.D. Mich. 1991) ("The cash collateral order, which grants to Comerica [the secured lender] a post-petition lien on all of debtor's assets, attempts to immunize Comerica from surcharge payment obligations under *11 U.S.C. § 506(c)*. Such a provision is not enforceable in light of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper

### (3)    The Complaint's Equity Counts Are Rooted in the Court's Prior Orders and Are Not Preempted

A straight-forward examination of the Complaint shows that the counts that assert equitable principles in support of the enforcement of the Court's prior orders are not independent state law claims preempted by the Bankruptcy Code.

The Complaint alleges, in its general allegations, which are incorporated into and made a part of each subsequent count, that the Interim Financing Order and the 721 Order require that "persons and entities that supplied necessary goods, services, and airport space (and related facilities) to keep the Contract Services Division and the Air Cargo Division in operation, so that they could be sold as going concerns, would be paid either from the operating revenue, from the funds which the Debtor was authorized to borrow, or (if those sources were insufficient) from the proceeds of sale (as 'costs of sale') before the net proceeds of the sale were delivered to GMAC and/or Yucaipa" (Paragraph 28); that "[t]he Debtor, and subsequently the Trustee, paid for certain of the necessary

---

disposal."). As the *Ridgeline* court noted, a creditor should not be permitted to (footnote continued)
invoke such a waiver to escape responsibility for its "egregious conduct." Permitting a surcharge waiver provision to be employed by a secured creditor to defeat the substantive provisions of the same order, and to keep more sale proceeds than the creditor is otherwise entitled to, amounts to an abusive and illogical result.

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 27 of 41

goods, services, and space from revenues or borrowed funds, but failed (either through neglect or deliberately) to pay for other necessary goods, services, and space, including, in particular, the goods, services, and airport space (and related facilities) furnished by the Plaintiffs" (Paragraph 29); that the Trustee closed the sale of the Contract Services Division and the Air Cargo Division and turned over approximately $16,000,000 to GMAC and retained approximately $4.6 million but "did not pay (and has not paid) the amounts owed to Plaintiffs" (Paragraphs 30 and 31).

      The Complaint then alleges four counts for each of the three Plaintiffs and incorporates the foregoing allegations into each count. The first count says that payment for the unpaid costs of sale is required by Court order, that the Trustee was obligated to deduct and pay that amount prior to making distribution of the net proceeds to GMAC, and that the Trustee did not do so and is liable to the Plaintiffs. The second count says that the Plaintiffs earned the right to be paid (quantum meruit) and that it would be inequitable not to make that payment. The third count says that, if GMAC and/or Yucaipa are permitted to keep money that should have been deducted from the proceeds of sale and paid to the Plaintiffs, GMAC and Yucaipa will be unjustly enriched (unjust enrichment). The fourth count says that, prior to the distribution of sale proceeds to GMAC and/or Yucaipa, the Trustee was obligated to deduct and pay to the Plaintiffs the amounts owed for

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 28 of 41

costs of sale and that GMAC and/or Yucaipa are liable for the funds improperly paid and received ("money had and received"). The Complaint prays that the Court order the Trustee to pay the unpaid costs of sale and that GMAC (and/or Yucaipa) be ordered to disgorge (return) the funds improperly paid and received so that the Trustee may do so (or that they be ordered to pay the improperly received funds over to the Plaintiffs directly).

GMAC and Yucaipa incorrectly refer to the last three counts as "state law surcharge theories" and claim that they are preempted by the Bankruptcy Code. As explained earlier, the Plaintiffs do not seek a surcharge under section 506(c) of the Bankruptcy Code or under equitable principles. Plaintiffs seek enforcement of the Court's orders which contemplated and provided for the deduction of costs of sale prior to paying over the net proceeds to GMAC. The last three counts asserted on behalf of each Plaintiff (the "Equity Counts") are not based on independent state law claims but rather are directed to this Court's inherent equitable powers to enforce its own orders.

The Plaintiffs' Equity Counts are directed to this Court's equitable jurisdiction. *See Young v. U.S.*, 535 U.S. 43, 50 (2002) ("bankruptcy courts . . . are courts of equity and 'apply the principles and rules of equity jurisprudence'") (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939)); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir.

2300050C.doc

- 24 -

2003) (noting that "the issue before us today concerns a *bankruptcy court's equitable power* to craft a remedy when the Code's envisioned scheme breaks down" (emphasis in the original), and proceeding to craft such a remedy by conferring standing on a creditors' committee to assert avoidance actions); *Thompson v. Margen* (*In re McConville*), 110 F.3d 47, 50 (9th Cir. 1997) ("within the limits set by the Code, a bankruptcy court must do equity") (citing *Bank of Marin v. England*, 385 U.S. 99, 103 (1966)).  The Ninth Circuit has said:

> The overriding consideration in bankruptcy is that equitable principles govern.  The old equity notions -- equity loves equality, equity is equality, equity considers done what ought to be done -- still have vitality. Nonetheless, the principles of equity may not be invoked in freewheeling fashion. They must be directed to the care and preservation of the estate. They also necessarily operate within the boundaries set by statute.

*In re Tucson Yellow Cab Co.*, 789 F.2d 701, 704 (9th Cir. 1986) (internal quotations and citations removed).  The Plaintiffs' Equity Counts are grounded in this Court's inherent powers to interpret and enforce its own orders.  (The fact that equitable principles may also be part of the common law of a state – or of most states – does not make them state law preempted by the Bankruptcy Code.)

GMAC asserts that "courts routinely hold that the Bankruptcy Code preempts state law claims alleging unjust enrichment, misconduct, or violations of the Code itself." *Defendants' Memorandum* at 11.  This blanket statement is too broad and is inaccurate as applied to the facts of this case.  Whether or not a state

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 30 of 41

law claim is preempted in the bankruptcy court depends on the circumstances of the claim and the relief sought. The cases cited by GMAC and Yucaipa do not support its argument that equitable relief to enforce the Court's own orders is preempted in this case.

The Defendants cite one case, *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910 (9th Cir. 1996), for the general proposition that the Bankruptcy Code preempts state law, and four cases specifically concerning preemption of unjust enrichment claims. Three of these "unjust enrichment cases" concerned complaints by debtors against creditors who solicited reaffirmation agreements from the debtors but never filed the agreements with the court, as required by section 524(c)(3). See *Pereira v. First N. American Nat'l Bank*, 223 B.R. 28 (N.D. Ga. 1998) (class action for unjust enrichment filed in district court after bankruptcy case concluded); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417 (6th Cir. 2000) (claim for unjust enrichment and accounting filed in district court following conclusion of bankruptcy case); *Cox v. Zale Delaware Inc.*, 242 B.R. 444 (N.D. Ill. 1999) (class action for unjust enrichment filed in district court action after bankruptcy case closed). The fourth case cited by the Defendants, *Lenoir v. GE Capital Corp.*, 231 B.R. 622 (Bankr. N.D. Ill. 1999), concerned an attempted class action filed in the bankruptcy court complaining of a creditor's pattern of filing

inflated proofs of claim allegedly in violation of New York consumer protection law.

In each case, the plaintiff pled a state law unjust enrichment cause of action, and in each case the court determined that specific sections of the Bankruptcy Code preempted the state law cause of action. Because "the Bankruptcy Code provides the remedial scheme for addressing violations of Sections 362 and 524," *Pereira* at 31, and filing inflated claims, *Lenoir* and *MSR*, the independent state law actions were preempted.

Several of the cases cited by the Defendants point out that the correct remedy in these cases was an action in the bankruptcy court for contempt sanctions. See *Cox*, 242 B.R. at 446 ("[T]he only option to the appellant is to seek contempt sanctions in the Bankruptcy Court in which the discharge was issued"); *Pereira*, 223 B.R. at 31 ("[T]he Bankruptcy Code provides the remedial scheme for addressing violations of Section 362 and 524, including the filing [in the bankruptcy court] of civil contempt proceedings under the bankruptcy court's inherent contempt power and Section 105."); *cf. MSR*, 321 B.R. at 916.

*MSR*, cited in the Defendants' Memorandum, is an example of a bankruptcy debtor trying to "double dip" – first, by availing itself of its remedy under bankruptcy law, and then, after having obtained that remedy, seeking further remedies under state law in a separate action. In *MSR*, a creditor filed allegedly

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 32 of 41

inflated claims in MSR's Chapter 11 bankruptcy case. The debtor objected to the claims; the claims were disallowed; and a plan was subsequently confirmed. Later, MSR decided it wanted more and filed a separate malicious prosecution action in the district court. The district court concluded that the malicious prosecution action was preempted, and "could only be pursued in the bankruptcy court itself." *MSR*, 74 F.3d at 912. On appeal, the Ninth Circuit correctly held that the "action . . . is completely preempted by the structure and purpose of the Bankruptcy Code" and that the "claim . . . should have been in the bankruptcy court itself, and not as a separate action in the district court." *Id.* at 916.

None of the cases relied upon by the Defendants stands for the proposition that a bankruptcy court lacks power – whether exercising its equitable or legal power – to enforce its own orders.

This action, to enforce this Court's prior orders, has been brought as an adversary proceeding in the bankruptcy case itself. Motions were made by the Plaintiffs in the main bankruptcy case for the relief sought here. The Court, however, directed that relief should be sought by an adversary proceeding. The Plaintiffs seek to enforce this Court's orders *before the court that issued the orders*. The Plaintiffs' Equity Counts do not seek relief separate and apart from the enforcement of the Court's orders – they merely assert equitable grounds for granting that relief.

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 33 of 41

### (4) *Hen House* Does Not Bar a Claim for Disgorgement of Improperly Disbursed Funds

Having mischaracterized the Plaintiffs' claims as an attempt to surcharge administrative expenses under section 506(c), the Defendants assert that the Plaintiffs' claims are barred by *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000), commonly referred to as the *Hen House* case. *Hen House* holds that administrative claimants lack standing to pursue a surcharge. GMAC's premise is incorrect. The Plaintiffs' claims are not for surcharge, but for enforcement of the Court's prior orders and for the recovery of funds incorrectly paid to GMAC.

The creditor in *Hen House* was an insurance company which provided coverage to the debtor without even knowing of the debtor's bankruptcy case. *Id.* at 4. Once alerted to the proceedings, the insurer attempted to recover its administrative expense claim as a surcharge against the collateral of a secured creditor. The Supreme Court held that only the trustee has standing to pursue a surcharge under section 506(c).

There are three significant features distinguishing *Hen House* from the present case.

First, in the present case, goods, services, rental space, and landing rights were supplied to the Debtor pursuant to a court order authorizing the Debtor to incur debt for the purpose of operation and sale of the business divisions,

2300050C.doc

- 29 -

directing the Debtor to pay current expenses from the working capital provided by the financing, and providing that only net proceeds were to be turned over to the secured creditors. The Plaintiffs undertook to provide goods, services, rental space, and airport facilities with the understanding that the Court's orders would be obeyed and that they would be paid. The insurer in *Hen House* had no knowledge of the bankruptcy proceedings, and no expectation of court ordered payment.

Second, unlike the present case, at the time of the order authorizing Hen House to use loan proceeds to purchase insurance, Hen House was not seeking to sell an operating division, the insurance was not provided to enable a sale, and the expense was a general administrative expense and not a cost of sale. Accordingly, there was no direction or order that only net proceeds were to be turned over to the secured creditor.

Third, the Plaintiffs do not seek a surcharge under section 506(c) and are not claiming standing to do so. The Plaintiffs seek payment to which they are entitled under the Court's prior orders. The Debtor and the Trustee should have paid the expenses of operating the Contract Services Division and the Air Cargo Division and selling them as going concerns. Any amounts not paid by the Debtor or the Trustee prior to closing the sales should have been paid by the Trustee at the time of closing, and only the net proceeds should have been turned over to GMAC. The Trustee's failure to adhere to the Court's orders should not force the Plaintiffs

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 35 of 41

to subsidize GMAC's recovery, or entitle GMAC or Yucaipa to keep funds that were incorrectly turned over to GMAC. The fund should be disgorged, and the Motion to Dismiss should be denied.

### C. The Complaint Pleads Sufficient Facts for Relief

The crux of this dispute is the interpretation and enforcement of this Court's prior orders.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Complaint alleges, in detail, that, unless the Contract Services Division and the Air Cargo Division were kept alive as going concerns, they did not have much value; that, under the prior orders of this Court, the Plaintiffs were entitled to be paid for goods, services, rental space, and airport facilities furnished by the Plaintiffs and used by the Debtor and the Trustee to keep the Contract Services Division and the Air Cargo Division alive so that they could be sold as going concerns; that these costs constituted costs of sale; that the Debtor and subsequently the Trustee failed to pay the costs of sale when the divisions were

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 36 of 41

operated and the Trustee failed to pay the unpaid costs of sale at the time the sales were closed; and that the Trustee turned over more than the net proceeds to GMAC. As a consequence, GMAC got more than the net proceeds it was entitled to receive under the prior orders of this Court. The Complaint asks that the Court order the Trustee to pay the unpaid costs of sale and that GMAC (and/or Yucaipa) be ordered to disgorge the funds improperly paid and received so that the Trustee may do so.

The facts are more than plausible from the face of the Complaint – they are compelling. The Defendants got more than the net proceeds they were entitled to receive under the Court's prior orders and the Plaintiffs are entitled to have the excess funds returned to the Trustee for payment to the Plaintiffs (or to have the payment made directly to the Plaintiffs). The Motion to Dismiss, therefore, should be denied.

## IV. CONCLUSION

The essence of judicial power is the power of the court to enforce is orders.

This Court has the inherent judicial power to enforce its orders and it has available to it all writs ("any order, process, or judgment") that are required to do so. Bankruptcy Code §105 (11 U.S.C. § 105). Moreover, no provision

2300050C.doc
- 32 -

regarding standing can be "construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders . . . ." *Id.*

Shortly after the commencement of the Aloha Airlines bankruptcy case, the passenger service divisions collapsed. Aloha Airlines and its secured creditors, GMAC and Yucaipa, were left with two operating divisions – the Contract Services Division and the Air Cargo Division – which, by all accounts and the admission of GMAC, did not "have much value" if they were not sold as going concerns.

A straight-forward plan was hatched: GMAC would provide a loan for working capital so that vendors and laborers would supply goods and services to keep the business segments alive in order that the business segments could be sold as going concerns. The net proceeds of sale, after payment of the goods and services necessary to keep the business segments alive, were to be remitted to GMAC. As the Court characterized it: "let those operations continue so that they can be sold essentially for the benefit of GMAC and GMAC will make sure nobody gets hurt, okay." *Transcript of Hearing, October 9, 2008* [Docket No. 1174], at 24. The Court approved the plan.

The plan worked for GMAC. The business segments were sold for over $20 million. Approximately $16 million was distributed to GMAC.

U.S. Bankruptcy Court - Hawaii   #09-90042   Dkt # 20   Filed 11/23/09   Page 38 of 41

In the process – whether through inadvertence, negligence, or willful misconduct – the State, Gasco, and HECO were not paid for utility services, rental space, and landing rights that they supplied which kept the Contract Services Division and the Air Cargo Division alive for purpose of sale. In the Court's words, they "got hurt." They should have been paid the amounts owed as costs of sale, and only the net proceeds of sale should have been remitted to GMAC under the Court's orders. The simple fact is that GMAC received from the Trustee approximately $544,000 more than it should have received under the Court's orders.

The Defendants say that Plaintiffs are seeking a surcharge and that they are precluded from doing so because they lack standing to assert a surcharge and that the Debtor and the Trustee waived a right of surcharge. The Plaintiffs do not assert a right of surcharge against funds that were supposed to be distributed to GMAC under the Court's order. They seek a disgorgement of funds that should have been paid to the Plaintiffs but instead were wrongfully paid to GMAC and constitute funds to which GMAC has no entitlement.

The rights of GMAC and Yucaipa under the Interim Financing Order and the 721 Order cannot logically be read to displace the claims of the State, Gasco, and HECO for payment for goods, services, and airport facilities they furnished pursuant to those same orders to keep the Contract Services Division and

the Air Cargo Division from evaporating. Any such reading would make the purpose of the financing (to advance working capital to allow the costs of the operations to be paid so that the operations could continue in business, be sold as "going concerns," and their net value realized for the benefit of GMAC) illusory and the protection of vendors who furnished necessary goods and services to enable the sales a sham.

The language of the Interim Financing Order and the 721 Order cannot be read or be applied in a way that prevents payment of the very expenses that were intended to be paid.

The Plaintiffs have also asserted equitable grounds for the enforcement of this Court's prior orders and for the disgorgement of funds improperly paid to GMAC. The Defendants assert that the counts alleging equitable grounds for enforcement of the Court's prior orders are state law theories or state law claims that are preempted by the Bankruptcy Code. As explained above, the Complaint was filed in this Court to obtain compliance with the Court's orders (and to remedy non-compliance). The Court has inherent jurisdiction to enforce its own orders and a full range of equitable remedies to do so.

When a trustee improperly disburses money contrary to the terms of a bankruptcy court order, the remedy is to have the recipient disgorge the funds improperly distributed and received and to have the trustee pay those funds over to

U.S. Bankruptcy Court - Hawaii  #09-90042  Dkt # 20  Filed 11/23/09  Page 40 of 41

the party entitled to be paid under the court's order. That is what the so-called equity counts seek. If the Court concludes that the equity counts are preempted (which they are not), the counts should not be dismissed with prejudice, but rather with leave to amend. The Plaintiffs will be more than willing to re-cast their Complaint to assert entitlement under declaratory relief, civil contempt, and other causes of action.

DATED: Honolulu, Hawaii; _____November 23, 2009_____.

_____

CUYLER SHAW
KEVIN W. HERRING
MIRANDA TSAI
Attorneys for the STATE OF HAWAII

_____

DON JEFFREY GELBER
Attorney for THE GAS COMPANY, LLC

_____

KIMO C. LEONG
Attorney for HAWAIIAN ELECTRIC COMPANY

2300050C.doc

- 36 -